IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MATTHEW T. MGLEJ,<br><br>Plaintiff,<br>v.<br><br>GARFIELD COUNTY et al.,<br>Defendant. | **MEMORANDUM DECISION &<br>ORDER**<br><br>Case No. 2:13-cv-713<br><br>Judge Clark Waddoups |

Before the court is a Motion for Summary Judgment of Plaintiff Matthew Mglej's § 1983 action filed by Defendants Raymond Gardner and Garfield County.[1] (ECF No. 111.) Defendants contend the events at issue in this action did not violate Mr. Mglej's constitutional rights, and even if they did, Officer Gardner is entitled to qualified immunity. They also argue there was no policy or custom in place that creates a basis for county liability. The court heard oral argument on the matter on September 11, 2018. (ECF No. 146.) Having considered the briefing and oral argument, and otherwise being fully informed, the court now GRANTS in part and DENIES in part Defendants' Motion for the reasons stated herein.

## FACTS

In the summer of 2011, Plaintiff Matthew Mglej left his home in Oregon and headed by motorcycle across the American West toward Dallas, Texas. (Plaintiff's Response 3, ECF No.

---

[1] The Garfield County Jail and the Garfield County Sheriff's Office are named as separate defendants, but they are not properly included as separate entities from the County. Additionally, Mr. Mglej names Doe defendants who have never been named and therefore are dismissed with prejudice.

132.) He was going to meet family he had never known. (Mglej Deposition 11: 12–23, ECF No. 132-5.) His plans were disrupted when he experienced mechanical problems outside of Boulder, Utah. (Plaintiff's Response 4, ECF No. 132.) Boulder is a rural town with about 200 residents. (Gardner Declaration ¶ 5, ECF No. 112.) His engine was "burping" and "cutting in and off," and he needed a tire repair. (Mglej Deposition 16: 18–22, 23: 14–16, ECF No. 132-5.s) He went into town and asked around for the mechanic and learned that Chuck Gurle was the only mechanic in town. (*Id.* at 23: 21–24: 20.) When Mr. Mglej could not find Mr. Gurle, he returned to town and eventually found another traveler with whom he camped for the night. (*Id.* at 25: 4–28: 15.)

In Boulder, Mr. Mglej experienced a largely welcoming community where he waited for the local mechanic to repair his bike. Eventually Mr. Mglej found Mr. Gurle, who invited him to stay in his home while he repaired the bike, which required a tire to be shipped.[2] (Plaintiff's Opposition 11, ECF No. 132; Mglej Deposition 47: 12, ECF No. 132-5.) He spent his days socializing with staff and guests at the Boulder Exchange and the Burr Trail Grill and other local places where he felt the community "took [him] in." (Mglej Deposition 42: 16–46: 21, ECF No. 132-5.). He "made a lot of friends" and "became very close to the community." (*Id.* at 37: 13–14.)

But Mr. Mglej eventually came into contact with law enforcement. Mr. Mglej and Officer Raymond Gardner of the Garfield County Sheriff's Department tell markedly different accounts of their first interaction. Mr. Mglej testified in his deposition that he saw Officer Gardner several

---

[2] Defendants argue that the property where Mr. Mglej stayed was a part of a business and therefore public property. But they concede that there was a residence on the property and that residence is where Mr. Mglej spent his time while in Boulder. (Defendants' Motion viii, ECF No. 111.)

times and felt Gardner was "eyeing [him] down, like, who is this guy." (*Id.* at 37: 18–25.) Then "at one point [Mglej] was driving [his] motorcycle and [he] was going to the Boulder Exchange, and [Gardner] pulled [him] over" for speeding, approximately five miles over the limit. (*Id.* at 38: 14–24.) Mr. Mglej testified that Gardner asked him who he was, where he was from, and why he was in town. (*Id.* at 39: 7–12.) Mr. Mglej also asserts that he gave Officer Gardner his ID card during this initial interaction. (*Id.* 54: 25–55: 1.) Mr. Mglej claims that Officer Gardner ultimately gave him a warning and let him go. (*Id.* at 39: 10–12.) Mr. Mglej reports this interaction occurred two or three days after he arrived in town. (*Id.*) Officer Gardner denies he ever pulled Mr. Mglej over for speeding. (Gardner Depo. 27: 24–25.)

Officer Gardner states instead that one day in the summer of 2011, he "was pulled off on the side of the road, patrolling for speeding. (Gardner Affidavit ¶ 8, ECF No. 112.) While doing this, Mr. Mglej rode past . . . on his motorcycle." (*Id.*) He "did not attempt to pull Mr. Mglej over, and [he] remained parked off on the side of the road. However, Mr. Mglej turned around and came back to voluntarily speak with" him. (*Id.*) Officer Gardner's statement is that Mr. Mglej wanted to know how fast he was going and that he "did not ask for [Mr. Mglej's] driver's license at that time," even though he thought "the interaction was strange, which alerted [his] suspicions about Mr. Mglej." (*Id.* ¶ 9.)

Their next encounter occurred on August 8, 2011, around the time Mr. Mglej was preparing to leave town, and resulted in the alleged violation. After "about seven days" of being in Boulder, one day before his eventual arrest, Mr. Mglej's tire arrived, and Mr. Gurle installed it "right away." (*Id.* at 47: 12–22.) The following day, around midday, Mr. Mglej "was completely packed," and he and Mr. Gurle were "saying [their] goodbyes" while "hanging out" playing

music. (*Id.* at 51: 22–52: 11.) While this was going on, Officer Gardner came to the front door. (*Id.* at 52: 10–11.) "[H]e came and knocked on the door, and he was completely out of uniform or anything like that. It was very casual. It seemed like . . . it surprised Chuck." (*Id.* at 52: 23–25.) It was his day off, but he is the only officer in town, so Officer Gardner went to Mr. Gurle's house in civilian clothes for the purpose of investigating an alleged theft. (*Id.* at 35: 4–6, 36: 25–37: 2.)

Apparently, Officer Gardner had come to the Gurle's residence to follow up on a report from the Boulder Exchange, a local convenience store, that twenty dollars were missing from the till. (Plaintiff's Response Brief 6–7; ECF No. 132.) According to Officer Gardner, a female employee "had reported being made to feel uncomfortable by some of Mr. Mglej's comments. [And] this employee" reported "that when she had returned from using the restroom, money was missing from the cash register and [she] believed Mr. Mglej could have been responsible for its disappearance." (Gardner Affidavit ¶ 11, ECF No. 112.) Dispatch, who first received the call from the Boulder Exchange, apparently reported to Officer Gardner that Mr. Mglej was loitering but did not provide a basis for the employee's belief or communicate that Mr. Mglej made the employee uncomfortable. (Gardner Affidavit ¶ 11, ECF No. 112; Gardner Deposition 30:9–11; 31: 16–21.)

Following up on the call from Dispatch, Officer Gardner called the Boulder Exchange and asked about what happened. (*Id.* at 32: 1–3.) The employee who reported the incident told Officer Gardner that she did a "quick cursory check" of the till after briefly stepping outside and reported the apparently missing money, which "she thought" was twenty dollars. (*Id.* at 32: 10–21, 33: 3.) She also described the person she believed to have committed the offense—she

described a person who had been newly around town and who was staying with Mr. Gurle while having his bike repaired. (*Id.* at 33: 12–17.) Officer Gardner deduced that she was referring to Mr. Mglej. (*Id.* at 33: 18–21.) She did not indicate whether there were other patrons in the store at the time of the alleged theft. (*Id.* at 32–33.) She also reported that Mr. Mglej made "inappropriate comments" and that she felt uncomfortable. (*Id.* at 34: 11–19.) Mr. Mglej admits he was at the Boulder Exchange that morning but denies that the employee ever went outside while he was in the store. (Mglej Decl. ¶ 10; ECF No. 132-3.)

According to Officer Gardner, the Gurle residence, where Officer Gardner went after calling the Boulder Exchange, is approximately an eighth of a mile from the Burr Trail Road, which is a county road off of Utah Highway 12. (Gardner Deposition 37: 19–38: 3.) The Gurles live in a single-wide trailer and park a fifth-wheel camper on the property. (*Id.* at 38: 8–12.) They do not own the property. (*Id.* at 39: 1–2.) According to Officer Gardner, the property where the residence and camper are parked is called Belnap Rental. (*Id.* at 39: 3–11.) Officer Gardner contends that Mr. Gurle "does do some business at," what he calls, Belnap Rental. (*Id.* at 39: 14–15.) Mr. Gurle declares, however, that neither he nor his wife does any business from their home.[3] (Gurle Declaration ¶¶ 8–9, ECF No. 132-2.)

---

[3] At oral argument, Officer Gardner's counsel argued that even Mr. Mglej said there was a shop on site at Belnap Rental. He conceded, however, that this information was communicated after Mr. Mglej was asked a compound question, creating ambiguity about which question he answered affirmatively, and also conceding that Mr. Mglej was never asked whether Mr. Gurle used the shop for personal or commercial purposes. Because Mr. Gurle has stated there was no commercial activity conducted at his residence, and because the court is required to draw all reasonable inferences in favor of Mr. Mglej as the nonmoving party, the court concludes that on this record there is no basis to conclude as a matter of law that Mr. Gurle conducted commercial business on the property.

When Officer Gardner arrived at the Gurles' home, he knocked and asked for Matt, Mr. Mglej's first name. (Gardner Deposition 39: 23–24; Gurle Declaration ¶ 13, ECF No. 132-2.) When Mr. Mglej came to the door, Officer Gardner asked if they could talk outside, away from the door. (Gardner Deposition 40: 9–13.) Mr. Mglej agreed, and the two began to talk outside the trailer.[4] (*Id.* at 40: 18–23.) The parties disagree about the nature of the area outside the Gurle residence where Officer Gardner and Mr. Mglej had this conversation. Officer Gardner describes the area as a parking lot. (Gardner Declaration ¶ 14, ECF No. 112.) Mr. Mglej describes "a front yard with hard-packed dirt where [the Gurles] keep a fire pit and several lawn chairs." (Mglej Declaration ¶ 8, ECF No. 132-3.) Mr. Gurle's characterization of his residence echoes Mr. Mglej's description. (Gurle Declaration ¶ 7, ECF No. 132-2.)

Officer Gardner told Mr. Mglej that he had received a complaint from the Boulder Exchange, and Mr. Mglej said he was not involved with the missing money. (Plaintiff's Response Brief 9, ECF No. 132.) Officer Gardner stated that, nonetheless, he needed to complete a report that required certain information from Mr. Mglej, specifically Mr. Mglej's full name, date of birth, driver's license information, and address. (*Id.* at 10; Gardner Deposition 44: 2–3.) Officer Gardner agreed in his deposition that he believes he asked for Mr. Mglej's ID. (Gardner Deposition 41: 15–19.)

But Mr. Mglej did not believe Officer Gardner was entitled to this information, and he did not want to give it without first conferring with an attorney. (*Id.* at 43: 15–16; Mglej

---

[4] Officer Gardner recalls that it was at this point that he mirandized Mr. Mglej. (Gardner Deposition 46: 5–18.) Mr. Mglej denies that Officer Gardner ever read him his Miranda rights. (Mglej Deposition 61: 13–14.)

Deposition 54: 12–17.) Officer Gardner 's account is that he told Mr. Mglej he could talk with an attorney, but first he had to disclose his identity. (Gardner Deposition 43: 18–20.) And he did not first provide Mr. Mglej the opportunity to contact an attorney, because he "didn't have a reasonable expectation that [Mr. Mglej] knew of any attorney or had a phone number for an attorney or had worked for an attorney or had any kind of access to an attorney" because he was "on a road trip that eventually led him to Boulder, Utah." (*Id.* at 44: 21–45: 3.) Instead, Officer Gardner warned Mr. Mglej that if he was unwilling to identify himself, he would be placed under arrest. (*Id.* at 45: 14–18; 45: 25–46: 4.) When Mr. Mglej did not answer, Officer Gardner arrested him, using handcuffs even though Officer Gardner concedes that Mr. Mglej was "cooperative physically" and did not behave in a physically threatening manner. (Plaintiff's Response 11, ECF No. 132; Gardner Deposition 46: 19–21, 47: 4–11.) He seated Mr. Mglej in the front seat of his patrol vehicle. (Gardner Deposition 52: 19–21.)

Mr. Mglej's account of the pre-arrest encounter is that while Officer Gardner was asking for his information, Gardner was accusing him of taking the money. (Mglej Deposition 57: 3–9.) "Feel[ing] very uncomfortable," Mr. Mglej refused to answer Officer Gardner's questions without a lawyer and tried to call a lawyer but, when he reached for his phone, Officer Gardner said that if Mr. Mglej did not "put that phone down right now" he was going to "wrestle [Mr. Mglej] to the ground and tase [him]." (Mglej Deposition 58: 13–59: 4.) Mr. Mglej recalls that he was scared and that the next thing he knew he was in handcuffs and being put in the police car. (*Id.* at 60: 10–13.) Neither party suggests that Officer Gardner ever attempted to acquire a warrant before arresting Mr. Mglej.

Instead of going directly to the county jail, some ninety miles away in Panguitch, Utah, Officer Gardner decided to first stop at his home to change out of his civilian clothes and into his uniform. (Gardner Deposition 51: 2–5; Plaintiff's Response 12; ECF No. 132.) Officer Gardner provided no information that the change was necessary, only that he "thought it best" given the length of the drive. (*Id.* at 51: 4.) While Officer Gardner went inside, Mr. Mglej sat in the car alone with the doors unlocked, limited only by a seat belt and his arms handcuffed in the front. (*Id.* at 52: 22–53:2, 53: 25–54: 4.) Officer Gardner's family was inside the home, but he did not fear Mr. Mglej would try to escape. (*Id.* at 54: 6–8, 60: 15–18.)

During his deposition, Officer Gardner testified that he handcuffed Mr. Mglej "[p]er [Garfield County Sheriff's] department policy" that "whenever someone is placed under arrest, they are handcuffed." (*Id.* 46: 22–25.) He further stated that he had no discretion in deciding whether to handcuff Mr. Mglej. (*Id.* 60: 16–21.) In January of 2018, Officer Gardner supplemented his declaration to inform the court that it is his "practice to handcuff everybody [he] arrest[s] and transport[s] to jail." (Gardner Supplemental Declaration ¶ 1; ECF No. 137.) He has adopted this policy because he is "stationed so far away from any other law enforcement[5] and must transport persons a long distance to the jail, it is the safest practice for [him] to always handcuff persons [he] arrest[s]." (*Id.* ¶ 2.) He does this for his safety and the safety of the prisoner. (*Id.* ¶ 4.) And when he handcuffed Mr. Mglej, both upon the initial arrest and re-handcuffing after the incident in the garage, he did so "solely for safety reasons." (*Id.* ¶ 7.)

---

[5] The court takes judicial notice that Garfield County, Utah is a rural, sparsely populated, and far-reaching county and that Boulder is in approximately the middle of the county..

The Garfield County Sheriff's Department Policy related to handcuffing requires: [6] "Handcuffs . . . may be used only to restrain a person's hands to ensure officer safety." (County Policy 306.4, ECF No. 132-6.) It "recommend[s]" handcuffs "for most arrest situations," but reserves discretion to the officer to decide whether the situation "warrants that degree of restraint." (*Id.*) The Policy continues that "deputies should not conclude that in order to avoid risk every person should be handcuffed, regardless of the circumstances." (*Id.*) It also makes clear that "[w]hen feasible, handcuffs should be double-locked to prevent tightening, which may cause undue discomfort or injury to the hands or wrists." (*Id.*) Finally, "[h]andcuffs should be removed as soon as it is reasonable or after the person has been searched and safely confined within a detention facility." (*Id.*)

When Officer Gardner returned to his car, now in uniform, Mr. Mglej complained to him that the handcuffs were too tight. (*Id.* at 54:12–14.) Mr. Mglej contends he began complaining about the pain from the handcuffs almost immediately. (Plaintiff's Response 17, ECF No. 132.) When Officer Gardner noticed that Mr. Mglej's hands were red, he first tried to loosen them, but the cuffs malfunctioned and needed to be removed. (Gardner Deposition 54: 18–25, 55: 15–56:1.) Not having the proper tools, Officer Gardner believed he had to improvise and took Mr. Mglej to his garage. (*Id.* at 57: 9–12; Gardner Affidavit ¶¶ 33–34.) Officer Gardner apparently made no attempt to call for help from other officers in the county nor did he attempt to find the proper tools in town. Instead, in his garage, Officer Gardner used Mr. Mglej's hands as a fulcrum

---

[6] The version of the Policy manual that Mr. Mglej provided to the court is dated May 29, 2015. It is not clear the May 2015 Policy is the same as the Policy at the time of Mr. Mglej's arrest, but Officer Gardner did not object to its foundation or authenticity in his reply brief or at oral argument.

and employed various tools in a trial-and-error fashion, including "hand drills, different prongs, different pliers, different screw drivers, and different presses." (Mglej Deposition 75: 8–76: 18.) Eventually Officer Gardner put the handcuffs in a vice grip and worked them free of Mr. Mglej's wrists using two screwdrivers to pop them open in a manner that was extremely painful for Mr. Mglej. (*Id.* at 79: 6–80:10.) Officer Gardner stated that he did not know Mr. Mglej was in pain as he did not verbalize or otherwise express discomfort or pain. (Gardner Deposition 59: 6–11.) After removing the faulty handcuffs, Officer Gardner put new handcuffs on Mr. Mglej, returned to the car, and headed toward Panguitch. (Mglej Deposition 81: 3–5, 81: 25–82: 3.)

About half an hour into the two-hour drive to Panguitch, Officer Gardner received a phone call from the Boulder Exchange employee who had reported the missing money.[7] (*Id.* 82: 4–17.) She was calling to tell him that after "a more thorough examination of the till was made . . . the money was accounted for." (Gardner Deposition 63: 20–22.) Officer Gardner did not, however, release Mr. Mglej upon receipt of the phone call. (*Id.* at 64: 12–18.) Instead he continued on to the Garfield County Jail where he referred to a Utah Code book, completed a "no warrant fact sheet," and booked Mr. Mglej under two separate offenses: obstructing justice and failure to disclose identity.[8] (*Id.* at 64: 18–65: 9, 67: 10–21.)

---

[7] Officer Gardner claims the call came one and a half hours into his drive. (Gardner Deposition 63: 24–25.)

[8] There is no question that Officer Gardner did not have probable cause to arrest Mr. Mglej for obstruction of justice. Officer Gardner specifically listed Utah Code § 76-8-3(l)(i) as the charge. It states: "An actor commits obstruction of justice if the actor, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense: conceals information that is not privileged and that concerns the offense, after *a judge or magistrate* has ordered the actor to provide the information." Utah Code § 76-8-3(l)(i) (emphasis added). Because there was no order of a judge or magistrate, Mr. Mglej could not, at the relevant time, have been guilty of this crime.

According to Mr. Mglej, Officer Gardner did not know what charge he intended to book Mr. Mglej under until he got to the jail. (Mglej Deposition 86: 3–11.) Mr. Mglej alleges that when an officer at the jail asked what Mr. Mglej was being booked for, Officer Gardner responded, "I don't know. Let me look in the book. I'm sure I can find something." (*Id.* at 86: 5–6.) Officer Gardner contradicts Mr. Mglej's testimony. He says he knew at the time he decided to continue on to the jail after receiving the second call from the Boulder Exchange that he had arrested Mr. Mglej for failure to disclose identity and that delays in the booking process resulted from Mr. Mglej's continued refusal to answer questions.[9] (Gardner Affidavit ¶¶ 40, 43.) This was the first time Officer Gardner had ever arrested anyone with a failure to disclose identity. (Gardner Deposition 62: 6–8.)

The following day, August 9, 2011, Judge Russell Bulkley issued a Magistrate's Order that approved Officer Gardner's Statement of Probable Cause for a Warrantless Arrest and set bail for $1,000, reflecting $500 for failure to disclose identity and $500 for obstruction of justice. (Probable Cause Statement and Order, ECF No. 112-1.) But Officer Gardner's statement, upon which the magistrate concluded probable cause existed, did not assert any facts that would show Mr. Mglej was arrested at a public place, nor did the statement provide any facts that would demonstrate the obstruction of justice. (*Id.*)

Mr. Mglej's account of the conditions in jail include taunts by jailers, deprivation of food he could safely eat, and incarceration alongside troubled inmates who harassed him. He told the guards he had a dairy allergy; nevertheless, the guards fed him a sandwich of cheese and

---

[9] It is unclear to the court why this would be the case. Officers had apparently confiscated Mr. Mglej's wallet during the booking process and would have had access to his ID card.

mayonnaise and then proceeded to include dairy in each of his remaining meals while in custody. (Mglej Declaration ¶ 15.) He also says that he "was housed with another inmate who apparently suffered from schizophrenia and alcoholism. The guards refused to give the inmate his medication and he started behaving erratically and aggressively toward [Mr. Mglej]," causing him "intense mental and emotional anguish." (*Id.*)

Although bail was set on August 9, 2011, and Mr. Mglej immediately asked for his wallet so he could pay bail, the guards refused to give him his wallet until two days later on August 11. (Mglej Declaration ¶ 14.) At that time, they retrieved his wallet, and Mr. Mglej paid his bail by credit card. (*Id.*; Bail Payments, ECF No. 111-1.) Defendants provide no explanation for the two-day delay in Mr. Mglej's bail payment and release, although he apparently had the means to pay bail immediately. When Mr. Mglej was finally permitted to pay bail, he was released but not provided any transportation from Panguitch to Boulder. (Mglej Declaration ¶ 16.) Instead he "had to hitchhike back to Boulder. When [he] arrived [he] found that [his] bike had been vandalized by joyriders and that [his] possessions, including a digital camera, GPS, and video camera, had been stolen." (*Id.*)

Eventually all charges against Mr. Mglej were dropped (Mglej Deposition 100: 15–101: 9). But he contends he sustained damages from the arrest and initial prosecution. He was deprived of his liberty for several days. His damages also include lost property as previously detailed but also physical damage to his arms resulting from the handcuffing. He describes lasting "burning pain and numbness in [his] fingers that radiated up [his] arm to the elbow. (Mglej Declaration ¶ 17.) He has also "experienced significant emotional distress as a result of this ordeal. [He] suffer[s] from Asperger's Disorder, anxiety, and PTSD. . . . However, the

events the Boulder [sic] in August 2011 have exacerbated [his] symptoms, causing panic attacks, loss of sleep, general anxiety, and flash backs." (*Id.* ¶ 18.)

## STANDARD

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The nonmoving party may not rest solely on allegations on the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## ANALYSIS

When an individual believes his or her constitutional rights have been violated by a member of the government, he or she may bring a claim under 42 U.S.C. § 1983. Section 1983 exists to "protect the people from unconstitutional action under color of state law." *Patsy v. Bd. of Regents*, 457 U.S. 496, 503 (1982). It does so by creating a federal cause of action for the deprivation of constitutionally secured rights. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 755 (2005). Here Mr. Mglej has asserted that the various Defendants violated his Fourth, Eight

and Fourteenth Amendment rights. (Complaint, ECF No. 2.) Mr. Mglej alleges violations committed by individuals, specifically Officer Gardner as well as unnamed officers at the Garfield County Jail, and against the County and the County Sheriff. Because county liability depends in part on individual liability, the court first analyzes whether any individual could be held liable for the purported violations and then addresses the issue of county liability.

## I.     Individual Liability

On summary judgment, Officer Gardner argues he is immune from suit under the doctrine of qualified immunity. (Motion, ECF No. 111.) When a defendant raises a qualified immunity defense, the burden shifts to the plaintiff to demonstrate "'(1) that the defendant's actions violated a constitutional or statutory right, and (2) that the right allegedly violated was clearly established at the time of the conduct at issue.'" *Lee v. Tucker*, 904 F.3d 1145, 1148 (10th Cir. 2018) (quoting *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996)). "Under this test, 'immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018) (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)).

### A. Fourth Amendment Unlawful Arrest and Detention

Mr. Mglej's first cause of action alleges that while acting under the authority of Garfield County and the Sheriff's Office, Officer Gardner arrested him without probable cause and continued to detain him even after learning that in fact no crime had been committed. (Complaint ¶¶ 90–105.) An arrest is unlawful and in violation of the Fourth Amendment if it is not based on probable cause. *United States v. Rodriguez*, 739 F.3d 481, 485 n.2 (10th Cir. 2013). "Probable cause exists where the facts and circumstances known to the officer at the time of arrest, and of

which the officer had reasonably trustworthy information, were sufficient to warrant a prudent person in believing defendant had committed or was committing a criminal offense." *Id.* An officer may not have acted on probable cause where there is insufficient information or inadequate corroboration or where his or her conduct amounted to "'clos[ing] her or his eyes to the facts that would help clarify the circumstances of an arrest.'" *Cortez v. McCauley*, 478 F.3d 1108, 1116–17 (10th Cir. 2007) (quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)).

Thus, the court must determine "whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (internal citation omitted) (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011)). When evaluating whether probable cause supported an arrest, the court must "ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause," *Cortez*, 478 F.3d at 1116, and must consider "facts supporting probable cause," as well as "those that militate against it." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

In *Cortez v. McCauley*, the Tenth Circuit concluded that officers did not rely on probable cause. 478 F.3d at 1117. There, officers grabbed a suspect from his home in the middle of the night while he was wearing only shorts, handcuffed him, mirandized him, locked him in the back of a police car, and questioned him there. *Id.* at 1116. Officers were investigating an alleged sexual assault on a child. *Id.* at 1113. But the only evidence of the crime, or that the accused had committed it, was the statement of a distressed two-year old "that her babysitter's 'boyfriend' had 'hurt her pee pee.'" *Id.* Without any further investigation—without waiting for results of medical exam, without interviewing the alleged victim or her mother, and without ever

attempting to obtain a warrant—officers went to the accused's home and executed the arrest. *Id.* The Tenth Circuit, sitting en banc, unanimously concluded that officers' efforts were inadequate to support a finding of probable cause.

Here, Officer Gardner did not have probable cause to believe that a crime occurred or to suspect that Mr. Mglej committed any such crime. He received a phone call from Dispatch, which he attempted to corroborate by calling the source—the Boulder Exchange—but he gathered no more information. He had the statement of one witness that, upon a "quick cursory check," it appeared twenty dollars were missing and that Mr. Mglej had been in the store and made an employee "uncomfortable." As in *Cortez*, Officer Gardner did not conduct even the most basic corroborating investigation. He did not go to the Boulder Exchange, he did not inquire about whether there were other customers in the Boulder Exchange, he did not ask the employee to recount the till, he did not inquire about why Mr. Mglej's behavior made the employee uncomfortable, he did not ask whether anyone had seen Mr. Mglej at or near the till, and he did not interview Mr. Mglej about the purported theft before arresting him. In other words, he did not have "reasonably trustworthy information" to justify arresting Mr. Mglej for the theft. But even if he initially had probable cause for the arrest, the post-arrest phone call notifying Officer Gardner that all of the money was accounted for vitiated any reasonable belief that Mr. Mglej stole from the Boulder Exchange. Therefore, from the outset he did not have probable cause to arrest Mr. Mglej for the purported theft, but even if he had, he could not base the continued detention on suspicion of theft after he received the second call.

Officer Gardner argues, however, that he also arrested Mr. Mglej for the crime of failure to disclose identity and that probable cause existed for that charge, even if it did not exist for the

theft. The Utah Code permits an officer to arrest a person for failure to disclose identity if, "during the period of time that the person is lawfully subjected to a stop as described in Section 77-7-15" the following elements are met:

> (a) a peace officer demands that the person disclose the person's name; the demand described is reasonably related to the circumstances justifying the stop; (c) the disclosure of the person's name by the person does not present a reasonable danger of self-incrimination in the commission of a crime; and (d) the person fails to disclose the person's name.

Utah Code §§ 77-7-2 & 76-8-301.5. A person is lawfully stopped under § 77-7-15 if the stop occurs "in a public place when the officer has a reasonable suspicion to believe the person has committed or is in the act of committing or is attempting to commit a public offense and [to] demand the person's name, address, and an explanation of the person's actions." *Id.* § 77-7-15.[10]

Mr. Mglej argues Officer Gardner could not have had probable cause to arrest him for failure to disclose identity because the arrest did not occur in a public place, Officer Gardner did not demand Mr. Mglej's name but instead asked for his ID, Officer Gardner's demand for Mr. Mglej's name was not reasonably related to the circumstances justifying the stop, and Officer Gardner did not actually believe at the time of the arrest that these elements were met but only surmised after the fact of Mr. Mglej's arrest during booking at the Garfield County jail. There is record evidence that supports Mr. Mglej's arguments.

---

[10] In other words, an officer who is properly conducting an investigatory stop in a public place may require the stopped person to communicate his or her name, address, and an explanation of his or her actions. And if the person refuses to provide his or her name, the officer may move to arrest the individual so long as the demand is reasonably related to the stop.

There is strong evidence that the stop, leading to the arrest, occurred in the Gurle's private yard, not a public place. Mr. Mglej testified that the area was a hard-packed driveway with lawn chairs and a fire pit, and Mr. Gurle described the area in the same manner. Mr. Gurle also declared that he conducts no commercial business at his residence. The only evidence to the contrary is Officer Gardner's statement of his unsupported belief that Mr. Gurle conducted business there.[11] At oral argument on the Motion, Officer Gardner's counsel implored the court to infer the Gurle's residence is a public place based on the various cars that are visible in an areal shot of the property, taken some time after the event. It is not the court's role, on summary judgment, to weigh these facts and decide which statements are more credible and which position is more likely true. Instead, because an arrest for failure to disclose identity is only proper if the failure occurred during a stop in a public place, the court concludes this factual dispute is material to resolution of Mr. Mglej's unlawful arrest claim.

There is also evidence to support Mr. Mglej's argument that Officer Gardner asked for and arrested Mr. Mglej for failure to provide his driver's license information, not for failure to state his name. Officer Gardner has acknowledged that he asked for Mr. Mglej's ID and told Mr. Mglej he was required to provide "basic information" including "name, date of birth, driver's

---

[11] The court notes that Officer Gardner's statements about what kind of business occurred at Belnap Rental have changed over the course of this action. In his deposition, Officer Gardner stated that Chuck Gurle is a mechanic whose "primary place of business is off Highway 12, approximately two miles from his residence" but who "does do some business at [his residence.]" (Gardner Deposition 38: 19–39: 15.) His deposition characterized Belnap Rental as "the name given" to the property where "Chuck rents [his] trailer," which is owned by "absentee property owners with the last name of Belnap." (*Id.* at 39: 1–6.) He then answered affirmatively that "Belnap Rental is not a business." (*Id.* at 39: 7–11.) In his declaration, however, Officer Gardner stated "Belnap Rental is a small agricultural rental business run by Chuck Gurle." (Gardner Declaration ¶ 13, ECF No. 112.)

license information, address." (Gardner Deposition 43–44, ECF No. 132-4.) The law did not permit Officer Gardner to arrest Mr. Mglej for failure to provide any information other than his name. And there is at least a reasonable inference, which must be drawn in favor of Mr. Mglej as the nonmoving party, that Officer Gardner was not arresting for failure to provide a name, given that he acknowledges he already knew Mr. Mglej's first name. A jury conclusion to this effect would be further supported if it accepted Mr. Mglej's account of his first encounter with Officer Gardner on the roadside during which, Mr. Mglej contends, he gave Officer Gardner his full name and ID card. Similarly there is a question as to whether Officer Gardner's demand for Mr. Mglej's name was reasonably related to the circumstances of the stop. Officer Gardner knew Mr. Mglej's name and did not need it for investigatory purposes, or at least he has not stated a need. These are all factual issues that are material and therefore properly decided by a jury.

Even if the demand for Mr. Mglej's identity occurred in a public place and was reasonably related to the investigative stop, there is conflicting evidence about whether Officer Gardner suspected Mr. Mglej of the crime of failure to disclose identity during the portion of his detention between the second Boulder Exchange phone call and the Panguitch jail. When assessing probable cause, the relevant inquiry is whether the "'facts known to the arresting officer at the time of the arrest'" would prompt an objectively reasonable officer to believe the individual in question had committed the offense. *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Officer Gardner has stated he believed at the time he received the phone call that Mr. Mglej had committed the crime of failure to disclose identity. Mr. Mglej on the other hand contends that he observed Officer Gardner ask for and peruse the Utah Code book in search of a charge when

they got to the jail.[12] Mr. Mglej's statement supports the conclusion that at the time of the arrest Officer Gardner did not know that failure to disclose identity was an arrestable offense, that he did not, therefore, have probable cause to arrest him for such a charge. This is yet another factual dispute that must be decided by a jury.

Whether the jury agrees with Mr. Mglej that the elements of the charge of failure to disclose identity could not have been met or that Officer Gardner did not know the facts necessary to arrest him for failure to disclose identity at the time of the arrest, it could conclude that the arrest was made without probable cause. Therefore, Mr. Mglej has raised questions of fact material to the probable cause inquiry such that his claim should survive summary judgment.

Nevertheless, because Officer Gardner has raised the defense of qualified immunity, the court must decide whether "the right was clearly established when the alleged violation occurred." *Cortez*, 478 F.3d at 1117. To satisfy the second prong of the qualified immunity analysis, a plaintiff must show that "[t]he rule's contours [are] so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). In other words, precedent must "be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* It is sufficient to rely on "[general statements of law'" where they "clearly establish a right for qualified immunity purposes if they apply 'with obvious clarity to the specific conduct in question.'" *Halley v. Huckaby*, 902 F.3d 1136, 1149

---

[12] Although an out of court statement, Mr. Mglej's account of Officer Gardner's statement is not hearsay because Officer Gardner is a named defendant in this action and therefore a party opponent. *See* Fed. R. Evid. 801(d)(2).

(10th Cir. 2018). In other words, "[q]ualified immunity leaves 'ample room for mistaken judgments,' protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Moore v. Godsil*, 505 F. App'x 780, 783 (10th Cir. 2012) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Here the law was clearly established: Officer Gardner could only arrest Mr. Mglej if he had probable cause to suspect him of the crime alleged, and he does not dispute that requirement. "The law was and is unambiguous: a government official must have probable cause to arrest an individual." *Cortez*, 478 F.3d at 1117. As to the arrest for the theft, *Cortez* made clear that this right includes the requirement that officers conduct some minimal investigation in order to evaluate probable cause. Specifically the Court concluded that at the time of the arrest in question, "it was established law that 'the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention.'" *Id.* (quoting *Romero v. Fay*, 45 F.3d 1472, 1476–77 (10th Cir. 1995)). *Cortez* predates the arrest now before the court; therefore, there is no question that the right not to be arrested for a crime for which the officer has conducted no meaningful investigation existed at the time of these events.

Regarding the arrest allegedly for the failure to disclose identity, the law requiring probable cause was unambiguous as was the law requiring officers to have knowledge of facts supporting probable cause at the time of the arrest. *Id.* at 1116. Similarly, the requirement that the failure to disclose identity occur in a public place for arrest to be proper is defined by statute and the distinction between a public place and a private residence is a matter of common sense,

at least in the context of a residence and under the facts of this case. Therefore, if a jury were to believe Mr. Mglej and Mr. Gurle's characterization of the property and assertions that no commercial business is conducted there, Officer Gardner could not have probable cause to believe he could arrest Mr. Mglej for failure to disclose identity because he was on private property. *See Moore v. Godsil*, 505 F. App'x 780, 784 (10th Cir. 2012) ("Here, the district court specifically noted the conflicting material facts related to the incident and articulated how these conflicting facts prevented a finding of probable cause. Viewing the facts in the light most favorable to plaintiff as the nonmoving party, which the court must do when considering summary judgment, a reasonable officer could have believed that he did not have probable cause to arrest plaintiff under clearly established law."). Mr. Mglej's account of the facts is one of plain incompetence and failure to know the otherwise clearly established law that, if believed, would preclude Officer Gardner from immunity. should not be permitted to avoid liability because he simply did not know the otherwise clearly established law.

### B. Fourth Amendment Excessive Force

Mr. Mglej's second cause of action alleges that Officer Gardner used excessive force by handcuffing him so tightly that it caused Mr. Mglej physical pain and loss of feeling in his hands and by taking Mr. Mglej to his garage and removing the handcuffs without the proper tools. (Complaint ¶¶ 106–117.) To survive summary judgment where Defendants have raised the claim of qualified immunity, Mr. Mglej must "show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law)." *Cortez*, 478 F.3d at 1128.

In assessing the reasonableness of the force Officer Gardner used, the court must balance "'the nature and quality of the intrusion'" on Mr. Mglej's interests "against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 397 (1989). It is Mr. Mglej's burden to show (1) that Officer Gardner "used greater force than would have been reasonably necessary to effect a lawful seizure" and (2) that he suffered "some actual injury" as a result of "the unreasonable seizure that is not de minimis, be it physical or emotional." *Cortez*, 478 F.3d at 1129. The reasonableness of the officer's conduct is a fact specific inquiry, which includes consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1125 (quoting *Graham*, 490 U.S. at 396). Force is not excessive if the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397 (1989). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* Here the circumstances surrounding Mr. Mglej's arrest justified only the most minimal force and the use of handcuffs was objectively unreasonable.

The force Officer Gardner used was not reasonable considering the circumstances. Because Officer Gardner lacked probable cause to believe a crime had occurred, any effort to constrain Mr. Mglej's liberty would have been excessive force, as demonstrated by an analysis of the *Graham* factors. Mr. Mglej was alleged to have stolen twenty dollars. It was a petty offense, not a serious crime, even if it had happened, which it did not, the alleged theft did not in any way suggest Mr. Mglej was violent or likely to flee. And while Mr. Mglej refused to provide his name

and/or ID as requested, he did not actively resist arrest nor did his conduct suggest he was likely to flee. And certainly the episode at Officer Gardner's home, in which Mr. Mglej sat in the unlocked car, fully undermines any belief Officer Gardner may have had about Mr. Mglej fleeing when he handcuffed Mr. Mglej the second time. In sum, none of the factors to be considered support Officer Gardner's claim that he reasonably used handcuffs to arrest Mr. Mglej.

Officer Gardner argues, instead, that because the use of handcuffs have been deemed reasonable during investigative searches, that of course they are reasonable during an arrest and he had a practice of handcuffing all arrestees. But neither of these arguments is persuasive. While some courts have found handcuffing appropriate, they did so in the context of the facts and circumstances before them, which are distinct from these. For instance, in the case to which Officer Gardner cites to support the proposition that handcuffing is proper during an investigative detention, *Muehler v. Mena*, 544 U.S. 93 (2005), officers were investigating "a gang-related, driveby shooting" and officers had reason to believe one of the gang members lived at the house they were searching. *Id.* at 95. They further suspected the wanted individual was "armed and dangerous." *Id.* When they searched the residence, they did so using a SWAT team and handcuffed the four occupants and then detained them in the garage, including the plaintiff, using handcuffs. *Id.* at 96.

In *Muehler*, the Supreme Court concluded that the use of handcuffs to restrain were under these circumstances reasonable, but the court emphasized three important details that make the analysis inapposite to this case. First, the search was pursuant to a warrant and officers have categorical authority to detain during a search pursuant to a warrant, so the initial detention was appropriate, making the handcuffing a minimal further intrusion. *Id.* at 99. Second, the Court

noted that "this was no ordinary search" and that "governmental interests in . . . using handcuffs[] are at their maximum when . . . a warrant authorizes a search for weapons and a wanted gang member resides on the premises" because of the "risk of harm to both officers and occupants." *Id.* at 100. Third, the court noted that "the need to detain multiple occupants made the use of handcuffs all the more reasonable." *Id.*

The facts of this case are nothing like those in *Muehler*. Mr. Mglej was the only potential suspect present, he was not violent or suspected of violence, and no search warrant minimized the intrusion as it did in *Muehler*. *Muehler* does, however, demonstrate an important point in evaluating the use of force: officers must in the moment, and courts must on review, look to the specific facts of an encounter and not make categorical conclusions and inferences like the one Officer Gardner advocates. While it is true that handcuffing is sometimes appropriate in the context of an investigative detention, *Muehler* does not stand for the proposition that it is always appropriate during either an investigative detention or an arrest. *See Fisher v. City of Las Cruces*, 584 F.3d 888 (10th Cir. 2009) (finding issues of fact existed for a jury to decide the reasonableness of the use of handcuffs where an arrestee had shot himself in the stomach and left bicep before police arrived on scene and was no longer in possession of the firearm when they arrived even though the plaintiff had resisted arrest). Thus, *Muehler* does not affect the court's conclusion that Mr. Mglej has stated facts from which a reasonable jury could conclude Officer Gardner used excessive force in arresting him.

And the law was clearly established. Officer Gardner knew he was obligated to make a case specific determination under both *Graham* and Garfield County policy. But he abdicated that requirement. Although the *Graham* factors do not "by themselves create clearly established

law outside an 'obvious case,'" *Kisela v. Hughes*, 138 S.Ct. 1148, (2018), the facts at bar are exceptional. As shown above, none of the *Graham* factors can be read to support a conclusion that force was appropriate. But even if application of the *Graham* factors to this case was not so obvious as to clearly establish the law, *Graham*'s requirement that all uses of force must be objectively reasonable under "the facts and circumstances of each particular case" is clearly established. *Graham*, 490 U.S. at 396–97. In other words, the law clearly established Officer Gardner's obligation to make an individualized determination of his use of force, even if the result of that individualized determination was not clearly established. Therefore, Officer Gardner's failure to make a case-specific determination, and the objectively unreasonable use of force by handcuffing a compliant man for suspicion of theft of twenty dollars, was a violation of a clearly established right.

Even though Officer Gardner's use of force alone was sufficient to satisfy the *Graham* factors and the law was clearly established, the Tenth Circuit has held that "in nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical restraint, handcuffing is appropriate." [13] *See Fisher*, 584 F.3d at 896 (10th Cir. 2009). Therefore, the Tenth Circuit has concluded that a plaintiff claiming improper handcuffing must

---

[13] The facts of this case suggest it may be the exceptional circumstance in which handcuffing is not appropriate and the plaintiff is, therefore, not required to show an injury. *See id.* at 896–97. Officer Gardner handcuffed Mr. Mglej based on his mistaken belief that departmental policy required him to do so, not because he believed public safety required the restraint. And although he did arrest Mr. Mglej, there are questions of fact that call into question whether the arrest was authorized. Finally, Defendants have not argued that an injury was required under these circumstances. But even if an injury is required, Mr. Mglej has adequately alleged such an injury as shown herein. The determination turns not on what Officer Gardner may have subjectively believed, but on what a reasonable officer would accept in light of clearly established County policy.

show some actual injury that is not de minimis. *Id.* at 897–98 (finding the plaintiff had alleged an injury sufficient for the issue to go to the jury).

Here Mr. Mglej has alleged he suffered injuries as a result of the tightness including pain and numbness in his fingers that radiates up to his elbows. (Mglej Declaration ¶ 17, ECF No. 132-3.) Although his declaration and the limited medical records he provides are not overwhelming support of a satisfactory injury, they provide some evidence from which a jury could conclude that he was injured by Officer Gardner's attempts to manipulate and remove the handcuffs without the proper tools and, apparently, without regard for further injury to Mr. Mglej in the process. Officer Gardner has not argued that Mr. Mglej's injury was insufficient to survive summary judgment, and the court will not conclude as much here. Further, the right not to be handcuffed in a manner that was unduly tight or that otherwise caused injury was clearly established by *Fisher. See also Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209–10 (10th Cir. 2008) (concluding officers were not entitled to qualified immunity where plaintiff alleged that he suffered from unduly tight handcuffs, that officers ignored his timely complaints, that his wrists began to bleed while he was handcuffed, that the pain had persisted, and that he had been diagnosed with permanent nerve damage); *Cortez*, 478 F.3d at 1129 ("[U]nduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight," but the injury must something more than "red marks that were visible for days."). Therefore, the court cannot decide as a matter of law that Mr. Mglej was not subject to excessive force nor can it conclude that Officer Gardner is entitled to immunity from liability for such a claim.

## C. Fourth and Fourteenth Amendment Malicious Prosecution

Mr. Mglej next contends that he suffered damages as a result of Officer Gardner's conduct which he alleges amount to malicious prosecution. (Complaint ¶¶ 118–24, ECF No. 2.) When analyzing a malicious prosecution claim in a § 1983 action, the court considers the elements of the common law malicious prosecution claim but must ultimately determine "whether plaintiff has proven a deprivation of a constitutional right." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257–58 (10th Cir. 2007). "A malicious prosecution claim brought under the Fourth Amendment requires a showing that '(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.'" *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014) (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir.2008)).

Officer Gardner contests only the third and fourth elements, arguing that Officer Gardner had probable cause to arrest Mr. Mglej and that he did not act maliciously when he did so. (Motion 7, ECF No. 111.) But as the court has already analyzed, there are disputes of fact material to the probable cause analysis and therefore summary judgment is not appropriate. And because "[m]alice may be inferred if a defendant causes the prosecution without arguable probable cause," *Stonecipher*, 759 F.3d at 1146, the court cannot evaluate whether Officer Gardner acted with malice without resolution of the disputed facts related to probable cause. And because there are disputes of material fact, the court cannot yet assess whether the right was clearly established at the time of the arrest. *See Nosewicz v. Janosko*, No. 18-1139, 2018 WL

5617756, at *8 (10th Cir. Oct. 30, 2018) ("Accordingly, genuine material disputed facts prevent a finding that defendant breached his duty under the Fourth Amendment or is entitled to qualified immunity.").

### D. Eighth Amendment Denial of Bail

Mr. Mglej next alleges that Doe Officers of the Garfield County Jail denied him the right to post bail. (Complaint ¶¶ 125–36, ECF No. 2.) He does not allege facts that link Officer Gardner to the denial of his bail nor has he come forward with evidence of such a link on summary judgment. And while he asserts compelling facts related to the officers at the jail, he has made no apparent attempt to identify the alleged Doe Defendants, he has never sought leave of the court to name them, and the court has by this decision dismissed them. *See Didymus v. Bivens*, Case No. 3:09-cv-62, 2011 WL 32207, at *7–*9 (E.D. Tenn. Jan. 5, 2011). In other words he contends his rights were violated, but he does not identify any responsible party. Assuming he intends for the County Defendants to be held liable for the conduct of its agents, there is no county liability as a matter of law. Therefore, summary judgment is proper as to this claim.

### E. Eight Amendment Cruel and Unusual Punishment

Finally, Mr. Mglej brings an Eight Amendment cruel and unusual punishment claim against each of the various Defendants. (Complaint ¶¶ 137–150, Complaint 2.) He alleges various violations related to the conditions of his detention at the Garfield County jail. Mr. Mglej's description of his detention is deeply troubling. But Mr. Mglej was not at the relevant time a convicted prisoner, and cruel and unusual punishment is therefore not an available cause of action. *See Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999). But Mr. Mglej now

argues that the Eight Amendment analysis for convicted prisoners is the same analysis as the Fourteenth Amendment Due Process Analysis, which applies to pretrial detainees like Mr. Mglej. *See id.* While the court is not persuaded that Mr. Mglej can reform his Complaint through his summary judgment papers, the court need not address the question of whether he can proceed with the claim, because even if he had pled the proper Amendment, he has not identified a responsible individual defendant nor has he set forth a theory for county liability. Therefore, summary judgment is proper.

## II.    County Liability

Having conclude that Mr. Mglej has provided a factual basis to conclude Officer Gardner violated his Fourth Amendment rights, the court must now turn to the question of whether any County Defendant can be held responsible. "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). It can, however, be held liable "for [its] own unlawful acts" if the plaintiff shows "the existence of a municipal policy or custom which directly causes the alleged injury." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017). The policy or custom requirement is met if plaintiff can show the violative conduct was pursuant to "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to who authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Id.* Mr. Mglej has not plausibly identified a policy that

can be imputed to Garfield County, the Garfield County Sheriff's Department, or the Garfield County Jail.

Mr. Mglej argues that the county can be held liable for the conduct of Officer Gardner as well as the Doe defendants because "the facts . . . show the County exhibited deliberate indifference in its failure to train and supervise municipal employees." (Plaintiff's Response 48, ECF No. 132.) Specifically, he alleges that the "egregious" nature of the violations reveals the County's failures. (*Id.*) In order to make out a claim for "deliberate indifference for purposes of failure to train," a plaintiff must ordinarily show "[a] pattern of similar constitutional violations by untrained employees." . *Connick v. Thompson*, 563 U.S. 51, 62 (2011). In other words, the municipality must have some notice that its "training is deficient in a particular respect" and ignore the deficiency. But he does not point to any specific conduct that can be attributed to any of the County Defendants, much less a pattern of indifference resulting in violations sufficient to put the county on notice and trigger liability. Because Mr. Mglej has not shown that Officer Gardner's conduct was pursuant to a County policy or custom, the County Defendants cannot be held liable and are dismissed from this action.

## CONCLUSION

Therefore, the court dismisses the Doe Defendants and GRANTS Defendants' Motion for Summary Judgment with regard to the County Defendants. It also GRANTS Defendants' Motion as to the Eight Amendment Denial of Bail and Cruel and Unusual Punishment claims. But it DENIES Summary Judgment of the Fourth Amendment claims for unlawful arrest, excessive force, and malicious prosecution because there are disputes of material fact. The court will hold a status conference on January 31, 2019, at 2:30 p.m. to set a trial date.

DATED this 10th day of January, 2019.

BY THE COURT:

_____
Clark Waddoups
United States District Court Judge